# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**1000 FRIENDS OF WISCONSIN, INC.,**
        **Plaintiff,**

  **v.**                                 **Case No.  11-C-0545**

**UNITED STATES DEPARTMENT**
**OF TRANSPORTATION, et al.,**
        **Defendants.**

---

## DECISION AND ORDER

The plaintiff in this case, 1000 Friends of Wisconsin, Inc., is a nonprofit organization dedicated to sound land-use planning.  It brings claims under the National Environmental Policy Act of 1969 ("NEPA") and the Administrative Procedure Act ("APA") challenging a decision of the Federal Highway Administration ("FHWA") and the Wisconsin Department of Transportation ("WisDOT") to expand a 19-mile segment of Wisconsin State Highway 23 from a two-lane roadway to a four-lane roadway.[1]  (In addition to FHWA and WisDOT, the plaintiff has named as defendants the United States Department of Transportation, the Secretary of the Department of Transportation, the Administrator of the Federal Highway Administration, and the Secretary of the Wisconsin Department of Transportation. However, FHWA and WisDOT are the main defendants.)  Below, I address the merits of the plaintiff's claims.

---

[1]In its amended complaint, the plaintiff raised a state-law claim under the Wisconsin Environmental Policy Act, Wis. Stat. § 1.11, and also a claim for violation of the Federal Aid Highway Act, 23 U.S.C. 128(a).  However, the plaintiff has not pursued either of these claims, and therefore I do not address them in this decision and order.

## I. BACKGROUND

In the geographic area that is relevant to this case, Wisconsin State Highway 23 connects the City of Sheboygan, which is located on the shore of Lake Michigan, to the City of Fond du Lac, which is located to the west. A stretch of Highway 23 emanating from Sheboygan is four lanes wide. But for the rest of the approximately 20 miles to Fond du Lac, Highway 23 is a rural two-lane roadway. The project under review will expand this segment of Highway 23 to four lanes and make other changes. The image below depicts the project area. The current two-lane portion is within the "EIS Study Limits."



Because the expansion of Highway 23 is a "major Federal action[] significantly affecting the quality of the human environment," NEPA required FHWA to prepare an environmental impact statement. 42 U.S.C. § 4332(2)(C). WisDOT helped prepare this statement and seems to have performed most of the work that is at issue in this suit.

2

The Highway 23 project has a long history, and the administrative record contains several draft and final impact statements that FHWA and WisDOT prepared over the years. In the late 1990s, state legislators with districts in the area of Sheboygan and Fond du Lac began to pressure WisDOT to schedule the expansion of Highway 23 to four lanes for the entire distance between the two cities. See R. 365, 849, 853. In 1998, WisDOT informed one of the legislators that it had no plans to commence such an expansion project soon, and that the project could not be planned until the state's Transportation Projects Commission (a commission composed of state elected officials and private citizens) recommended the project for "enumeration" in the state's next budget. R. 848. However, in 1999, without waiting for a recommendation from the Transportation Project Commission, the state legislature enumerated the project in a budget bill, with the result that WisDOT was required to proceed with construction. See Wis. Stat. § 84.013(3)(ra). An internal WisDOT email described the political process that resulted in the enumeration of the project:

> This project was placed in the budget by a certain legislator. That legislator either got the project into the budget in a trade for support of something else or it was his/her hit for the budget. I believe it happened in the caucus process, which is late at night and with only some folks. Given that it happened behind closed doors and outside of the [Transportation Projects Commission]—there are no rules. . . .
>
> . . . .
>
> [T]he project is enumerated. Since it is already enumerated we are required to schedule and build it just like any other enumerated major project. It now holds the same status as any other major project that went through the entire [Transportation Projects Commission] process.

R. 1498.

3

Once the project was enumerated, and because federal funds were to be used to build it, WisDOT, in conjunction with FHWA, began to study its environmental impacts under NEPA. The first draft of an environmental impact statement was issued in November 2004. R. 2244. It stated that the purpose of the project was "to provide additional capacity to serve existing and projected traffic volumes and to improve operational efficiency and safety for local and through traffic." R. 2252. As part of the NEPA process, various state and federal agencies submitted written comments on the draft statement. Members of the public also commented on the project. Many comments focused on whether it was really necessary to expand the highway to four lanes. These commentators questioned whether traffic levels on the highway would require additional capacity at any time in the near future, and they wondered whether any needed additional capacity could be supplied by making less drastic changes to the highway, such as by adding passing lanes in certain areas. See R. 2552 (comments of Wisconsin Department of Natural Resources); R. 3195–3200, 3205–06 (comments of Wisconsin Department of Agriculture, Trade and Consumer Protection).

In the years following the issuance of the draft impact statement, WisDOT continued to study the project and to address some of the issues raised by commentators. By 2009, no final impact statement had been prepared, and because of the lapse of time since the issuance of the draft statement, the agencies decided to prepare a supplemental draft environmental impact statement. The draft supplemental impact statement was issued on December 23, 2009. R. 10814. On June 3, 2010, the defendants issued a final environmental impact statement, in which they recommended that Highway 23 be expanded to four lanes for the entire remaining distance between Sheboygan and Fond

4

du Lac. R. 12578–13623. On September 27, 2010, FHWA issued a record of decision formally approving the expansion to four lanes. R. 13933.

In June 2011, the plaintiff commenced the present action. However, the parties requested that I stay the action because the defendants were contemplating further amendments to the final environmental impact statement that might render many of the plaintiff's claims moot. See ECF No. 12. I granted the request, and in January 2012, the defendants issued notice that they intended to prepare a "limited scope" supplemental environmental impact statement. At this point, much of the defendants' work involved dealing with new traffic projections showing that future traffic volumes on Highway 23 would be lower than projected during earlier stages of the NEPA process. On July 5, 2013, the defendants issued a draft limited-scope supplemental impact statement. R. 17842–18665. On March 17, 2014, they issued a combined final limited-scope supplemental impact statement and record of decision. R. 21309–22262. Once again, the defendants decided to expand Highway 23 to four lanes for the entire remaining distance between Sheboygan and Fond du Lac. R. 21329.

The plaintiff contends that the final limited-scope supplemental environmental impact statement is deficient. (For the remainder of this decision and order, I will refer to the 2014 final limited-scope supplemental environmental impact statement, which is located at R. 21309–22262 and which is the document under review in this action, as the "impact statement.") Although the plaintiff points to a large number of claimed deficiencies in the impact statement, it mostly focuses on two issues. First, the plaintiff contends that the methodology the defendants used to forecast traffic volumes on Highway 23 is both inadequately described in the impact statement and flawed, which rendered deficient the

5

defendants' evaluation of reasonable alternatives to the proposed action. Second, the plaintiff contends that the defendants did not adequately explore the alternative of adding passing lanes to Highway 23 rather than expanding it to four lanes. The plaintiff's remaining arguments are that the defendants failed to adequately consider the environmental impacts of "induced travel" and failed to adequately respond to comments on the 2004 draft impact statement that were made by two Wisconsin agencies.

## II. STANDING

Before proceeding to the merits, I briefly discuss the evidence the plaintiff has submitted to show that it has Article III standing. The defendants do not contend that the plaintiff lacks standing, but they remind me that I have an independent obligation to assure that standing exists. See Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009). Having reviewed the affidavits submitted by the executive director of 1000 Friends and several of its members, I conclude that the plaintiff has standing. An organization such as the plaintiff can assert the standing of its members. Id. at 494. Standing will be established if the evidence shows that the expansion of Highway 23 will threaten "the recreational or even the mere esthetic interests" of the members of 1000 Friends. See id. Three members of 1000 Friends have described how their recreational, esthetic, and other interests would be harmed by the proposed expansion of Highway 23. See ECF Nos. 39–41. One member in particular owns property adjacent to Highway 23 in the area slated for expansion and has had part of his property taken by eminent domain in preparation for the expansion project. See Decl. of Leonard Sobczak ¶¶ 3–17, ECF No. 39. This member states that expanding the highway will interfere with his enjoyment of his property by diminishing its

6

scenic beauty, among other things.  Id. ¶¶ 16–17.  For these reasons, I am satisfied that the plaintiff has standing.

### III.  MERITS

**A.**  **NEPA and APA Standard of Review**

NEPA "declares a broad national commitment to protecting and promoting environmental quality."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989).  It has been described as a "procedural" or "action-forcing" statute that does not "mandate particular results" but instead requires agencies to study and describe the environmental consequences of their proposed actions.  Id. at 348–51; Vermont Yankee Nuclear Power Corp. v. Nat. Res. Defense Council, 435 U.S. 519, 558 (1978).  Thus, under NEPA, if an agency has adequately identified and evaluated the environmental effects of its proposed action, it is permitted to take that action even if it is expected to be environmentally costly.  Robertson, 490 U.S. at 350.  Put differently, "NEPA merely prohibits uninformed—rather than unwise—agency action."  Id. at 351.

As I indicated earlier, NEPA requires agencies to prepare an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This impact statement is "a detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment."  Highway J Citizens Group v. Minetta, 349 F.3d 938, 953 (7th Cir. 2003).  Requiring an agency to prepare an impact statement serves NEPA's action-forcing purpose in two respects.  Robertson, 490 U.S. at 349.  First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."  Id.  Second, it "guarantees that the relevant

7

information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." Id. Thus, in the impact statement, the agency must "articulate why [it has] settled upon a particular plan and what environmental harms (or benefits) [its] choice entails." Simmons v. U.S. Army Corps of Eng'rs, 120 F.3d 664, 666 (7th Cir. 1997). The impact statement must show that agency officials have "[thought] through the consequences of—and alternatives to—their contemplated acts," and must ensure that "citizens get a chance to hear and consider the rationales the officials offer." Id.

Judicial review of an agency's compliance with NEPA occurs under the Administrative Procedure Act, which instructs courts to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); Highway J Citizens Group, 349 F.3d at 952.

## B.    Failure to Consider Reasonable Alternatives

An environmental impact statement must discuss alternatives to a proposed action. 42 U.S.C. § 4332(2)(C)(iii). The NEPA regulations[2] specify that an agency preparing an impact statement must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). The plaintiff contends that the defendants failed to comply with this requirement because the methodology they used to project traffic volumes on Highway 23 is both inadequately described in the impact statement and flawed. The plaintiff suspects that the projected

---

[2]Regulations relating to NEPA are promulgated by the Council on Environmental Quality. See, e.g., Dep't of Transp. v. Public Citizen, 541 U.S. 752, 757 (2004).

traffic volumes are too high, and that if the correct volumes were used, alternatives other than expanding the highway to four lanes, such as adding passing lanes to the existing two-lane roadway, would appear more attractive. The plaintiff also contends that the defendants did not adequately explore adding passing lanes to Highway 23 rather than expanding it to four lanes. This issue is related to traffic volumes, but it also involves the plaintiff's claim that the defendants evaluated only a "bare bones" passing-lane alternative and did not evaluate a "comprehensive" passing-lane alternative that incorporated other roadway improvements along with passing lanes.

### 1. Traffic Projections

The plaintiff raises several issues relating to the defendants' projections of future traffic volumes on the Highway 23 corridor. I will first explain what I have been able to discover regarding the methodology the defendants used to project future traffic volumes on Highway 23 and then discuss the plaintiff's specific arguments.

In the impact statement, the defendants include projections of traffic volumes at certain points on Highway 23 through the year 2035. See R. 21414. Based in large part on these projections, the defendants ruled out alternatives to expanding the highway to four lanes that involved passing lanes. See R. 21414–16, 21418–19, 21945–82. The defendants concluded that the passing-lane alternatives would not provide enough additional capacity to handle the projected traffic volumes at an acceptable "level of service," or LOS, through the year 2035. See e.g., R. 21415.

The methodology the agencies used to project future traffic volumes is explained in an appendix to the impact statement. See R. 21923–21944 (Appendix LS-A). According to the appendix, the traffic projections were prepared by WisDOT's Traffic

9

Forecasting Section. R. 21938. WisDOT's methodology involved using a combination of two forecasting tools: the Traffic Analysis Forecasting Information System ("TAFIS") and the Northeast Region Travel Demand Model ("TDM"). R. 21938–39. TAFIS is a computer program that compiles historic traffic-volume information and "other data" at state highway traffic-count sites (i.e., a site where WisDOT periodically measures actual travel volumes) and then performs a regression in order to project future traffic at those sites. R. 21939. In other words, TAFIS uses historical traffic counts to project by how much traffic volumes can be expected to grow in the future. It does not take other factors into account, such as expected changes in the population of the area, the expected locations of businesses and residences, or the number of lanes of the roadway. See R. 21939, 21940. In contrast, TDM is a model that attempts to account for factors other than historical traffic counts. It incorporates information about road networks, land use, demographics, and economic conditions, R. 21926, 21939, "analyze[s] future land use development scenarios to predict how and where future roadway traffic will go," R. 21939, and "accounts for anticipated changes in population and employment in specific locations," R. 21940. The growth rate that emerges from the TDM model "may not be less than 0.5% or greater than 5% unless there is significant change in model inputs such as socioeconomic data or the road network." R. 21927. Also, WisDOT states that it uses "sound and logical judgment" to determine if the resulting growth rate "makes sense intuitively." R. 21940.

When WisDOT uses both TAFIS and TDM to generate projections, as it did for Highway 23, it compares the growth rates independently produced by each tool. R. 21940. When TDM projects traffic volumes for a given future year that are greater than 10% over the volumes projected by TAFIS for the same year, WisDOT selects a "compromise"

10

number.  R. 21940.  That number is generally the number at "the edge of the accepted 10% range in TAFIS, so long as it is also within 10% of the [TDM] forecast volume."[3] R. 21940.  The compromise number allows TAFIS to act as a "check" on TDM:  Although TDM is generally regarded as producing a more accurate projection than TAFIS, it is possible that the TDM model has been "poor[ly] calibrat[ed]."  Ensuring that the TDM number is within 10% of the TAFIS number reduces the probability that poor calibration will result in an overestimate of the future traffic volume.  R. 21940.

One problem that the plaintiff identifies is that there is no comprehensive explanation in the administrative record of how TAFIS and TDM were applied to arrive at the traffic projections for Highway 23.  Although the defendants have provided the general discussion of TAFIS and TDM discussed above, they have not shown how the raw data that they used resulted in the bottom-line numbers that appear in the impact statement for each of the project alternatives.[4]  For example, the defendants do not identify the growth rate that the TAFIS regression produced or identify the specific traffic volumes that TAFIS projected for any year at any given location on Highway 23.  Although the record contains a general discussion of the kinds of data that are used in any TDM model, see R.

---

[3]I have been unable to find an example in the administrative record that illustrates how this process works.  However, it seems that the compromise is struck as follows. Assume TAFIS projects a traffic volume of 7800 autos per day for year 2035 and TDM projects a volume of 9500 autos per day for that same year.  The TDM volume is more than 10% greater than the TAFIS volume (10% of 7800 is 780, and 7800+780 is 8580, and 9500 is greater than 8580).  Reducing the TDM volume by 10% produces a volume of 8550.  The resulting compromise volume would be 8580, which is at the edge of the TAFIS 10% range and still within 10% of the TDM volume.

[4]The bottom-line projections for each of five project alternatives are depicted in Figure 2.6-8 at R. 21414.

11

14170–390, no document in the record allows a reader to understand how the specific TDM model used for Highway 23 produced the final numbers that appear in the impact statement. The defendants do not identify the actual traffic volumes that TDM projected for Highway 23 or explain whether they made adjustments to those volumes to bring them within 10% of the TAFIS numbers. The defendants do not explain whether the growth rate that TDM projected for Highway 23 was at least 0.5% but not greater than 5% or whether, if it was not, the defendants thought that such a rate was justified by "significant change in model inputs such as socioeconomic data or the road network." R. 21927. The defendants do not explain whether they made any adjustments to the TDM growth rate based on "sound and logical judgment" so that the rate would "make sense intuitively." R. 21940. In short, a reader of the impact statement and the administrative record has no idea how WisDOT applied TAFIS and TDM to produce the actual traffic projections that appear in the impact statement.

As noted, the plaintiff is skeptical that traffic volumes on Highway 23 will increase by as much as WisDOT has projected during the next 20 years. The plaintiff points out that traffic volumes peaked in about 2005 and have been declining ever since. The plaintiff contends that there are reasons to believe that this trend in declining traffic volumes will continue well into the future. These reasons include the aging of the Baby Boom generation, a reduction in the percentage of Americans in the labor force (which translates into a reduction in the number of trips made to and from the workplace), and the fact that those in the Millennial generation are choosing to drive less than members of previous generations have. See Pl. Rev. Br. at 40–42, ECF No. 53. Driven by its skepticism, the plaintiff asked the defendants to disclose more information about how they applied TAFIS

12

and TDM to arrive at the projected traffic volumes that appear in the impact statement, which seem to conflict with the recent trend of declining traffic volumes. See R. 22266. In responding to the plaintiff's comments on the impact statement, the defendants did not provide this information. See R. 22268–72. Rather, the defendants repeated and elaborated on their general discussion of how TAFIS and TDM work and did not explain how those tools were applied to arrive at the specific traffic projections that appear in the impact statement. Id.

The NEPA regulations require an agency to "identify any methodologies used" to arrive at conclusions that appear in an impact statement. 40 C.F.R. § 1502.24. This regulation has been interpreted to require agencies to discuss their methodologies in a way that is "'sufficient to enable those who did not have a part in its compilation to understand and consider meaningfully the factors involved.'" Izaak Walton League of America v. Marsh, 655 F.2d 346, 369 (D.C. Cir. 1981) (quoting Envtl. Def. Fund, Inc. v. Corps of Engineers, 492 F.2d 1123, 1136 (5th Cir. 1974)). As the District of Columbia Circuit has explained:

> NEPA clearly contemplates that the public should have an opportunity to challenge the adequacy of environmental impact statements. But without full disclosure the public would not be able to make independent judgments about the agency's action. Moreover, disclosure is necessary if the courts are to review environmental impact statements for compliance with NEPA.

Id. at 370 (citation omitted). In the present case, the defendants have not explained how they applied their methodology to Highway 23 in a way that is sufficient for either the court or the plaintiff to understand how they arrived at their specific projections of traffic volumes through the year 2035. They do not identify the independent projections that resulted from either the TAFIS regression or the TDM model and do not identify whether they made any

13

adjustments to those projections in an effort to reconcile them or to comply with other directives, such as the directive that projected growth generally cannot be less than 0.5% or the directive to ensure that all projections make sense intuitively. For this reason, the defendants have failed to comply with NEPA. This failure is not harmless. Rather, it has prevented the plaintiffs from being able to understand how the defendants arrived at traffic projections that seem at odds with current trends. Perhaps the defendants' projections are accurate, but unless members of the public are able to understand how the projections were produced, such that they can either accept the projections or intelligently challenge them, NEPA cannot achieve its goals of informed decisionmaking and informed public participation.

A related problem is that the defendants have not adequately explained how recently updated demographic data might affect the traffic projections that appear in the impact statement. When WisDOT built the TDM model that it applied to Highway 23, it used population projections prepared by the Wisconsin Department of Administration to estimate growth in the region through the year 2035. See Def. Br. at 19, ECF No. 59. Shortly before the defendants released the final impact statement in March 2014, the Department of Administration released new population projections, through the year 2040. These projections reflected a lower growth rate than was reflected in the Department's 2035 projections. See R. 21485. The plaintiff contends, and the defendants do not dispute, that the updated population projections from the Department of Administration showed that the population in the area of Highway 23 would grow only about one-third as quickly as the Department had previously projected. See Pl. Rev. Br. at 51, ECF No. 53.

14

In the final impact statement, the defendants disclose the updated population projections and acknowledge that such projections indicate that growth in the region will be lower than the defendants thought when they prepared the impact statement. R. 21485. The defendants state that "[t]he slower population growth may also slow the rate of development expected in the corridor." Id. However, nothing in the impact statement (or in anything else in the record) indicates that the defendants revisited their traffic projections in light of the recently updated population projections. Yet, because a key input into the TDM model is population growth, it would seem that a drastic reduction in expected population growth would likely produce a significant reduction in expected traffic growth. A significant reduction in traffic growth could, in turn, make one of the previously rejected passing-lane alternatives feasible. However, there is no indication that the defendants reexamined the passing-lane alternatives in light of the new population data.

The defendants seem to generally concede that they did not revisit their traffic forecasts or analysis of reasonable alternatives in light of the updated population projections. However, they point out that the Department of Administration's population data is only one among many sources that WisDOT used in projecting traffic volumes. See Def. Br. at 23, 28. They seem to be implying that a change in such population data will not undermine the traffic projections reached using the old data. Yet, the defendants never actually say that. In fact, from what the defendants have said about the TDM model, it seems that the Department of Administration's population data is a key component of the model, even if it is not the sole source of information concerning population trends. The Department of Administration data appears in an appendix to a document that purports to "validate" the model and is mentioned in the body of that document many times. See R.

15

14170–390.  It therefore seems that a significant change in the Department of Administration's population data will significantly change the traffic projections that emerge from the TDM model.

NEPA regulations impose a duty on federal agencies to supplement an impact statement when there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c).  The Supreme Court has recognized that "an agency need not supplement an [impact statement] every time new information comes to light."  Marsh, 490 U.S. at 373. However, "NEPA does require that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval."  Id. at 374.  In determining wether new information requires supplementation, courts are to apply a "rule of reason" that "turns on the value of the new information to the still pending decision-making process."  Id.  Because the environmental significance of new information is normally a question of fact that implicates substantial agency expertise, the court must defer to "the informed discretion of the responsible federal agencies."  Id. at 376-77 (internal quotation marks omitted).  In applying this standard of review, a court must ensure that the agency "conducted a reasoned evaluation of the relevant information and reached a decision that, although perhaps disputable, was not 'arbitrary or capricious.'" Id. at 385.

For the reasons I have discussed, it appears to me that the updated Department of Administration population data will significantly change the traffic projections and consideration of reasonable alternatives that appear in the impact statement, and that therefore supplementation of those parts of the impact statement may be required. Although the defendants contend that I should defer to their conclusions as to the

significance of the new population data, see Def. Br. at 29–31, here there are no agency conclusions to defer to. As I have explained, the impact statement contains no discussion indicating that the defendants considered whether the updated population data required reconsideration of the traffic projections and the rejection of the passing-lane alternatives. Although the updated population data appears in the impact statement as part of a background discussion of the region and the environmental effects of the project, see R. 21447–48, 21485, the agencies do not discuss the updated data in the context of the traffic projections and the consideration of reasonable alternatives. See R. 21414–19, 21923–98. Nor is there any other document in the administrative record indicating that the defendants considered whether the updated population data required supplementation of the traffic projections and reconsideration of reasonable alternatives. For these reasons, I am not satisfied that the agencies "made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." Marsh, 490 at 378.

Before moving on, I note that the plaintiff argues that the TDM model seems to have a high margin of error and that it does not have an established track-record of accuracy. See Pl. Rev. Br. at 36 n.28, 57–58; Reply Br. at 6–7. The plaintiff seems to be challenging WisDOT's decision to use TDM as part of its methodology for projecting traffic volumes. However, an agency "is entitled to use its own methodology, unless it is irrational," Sierra Club v. Marita, 46 F.3d 606, 621 (7th Cir. 1995), and the plaintiff has not shown that WisDOT's use of TDM was irrational. Although the plaintiff contends that TDM has a high margin of error when applied to rural roads such as Highway 23, the plaintiff has not pointed to any methodology for forecasting traffic on rural roads that might be more accurate than TDM. Moreover, as discussed, WisDOT did not rely entirely on TDM for its

17

traffic projections.  It also used TAFIS as a "check" on TDM's results.  Thus, I have no grounds for interfering with the defendants' choice of methodology.

### 2. Failure to consider "comprehensive" passing-lane alternative

The plaintiffs argue that besides using flawed traffic projections when evaluating reasonable alternatives, the defendants failed to adequately consider a "comprehensive" passing-lane alternative, as opposed to just "bare bones" passing-lane alternatives.  The plaintiff defines a comprehensive passing-lane alternative as one that "would combine a three-lane highway (with passing lanes) with other safety and mobility improvements."  Pl. Rev. Br. at 9.  These "other" improvements include things like reducing access points to the highway (such as at private driveways and cross streets), widening the highway's shoulders, and incorporating other traffic-management techniques.  The plaintiff contends that a comprehensive passing-lane alternative might have satisfied the project's purpose and need just as well as the selected expansion to four lanes, but with fewer environmental consequences.

I have reviewed the discussion of reasonable alternatives in the impact statement, including the technical discussion that appears in Appendix LS-B, and it seems to me that the defendants have evaluated comprehensive passing-lane alternatives.  To begin with, the defendants evaluated three different passing-lane alternatives: one that simply added passing lanes at certain points, one that incorporated left-turn lanes in addition to passing lanes, and one that involved expanding the highway to four lanes in a high-demand area and using passing lanes in other areas.  R. 21415–16.  One of the alternatives would have involved "upgrad[ing] side-road intersections" and installation of a "jug-handle intersection."  R. 21411.  Moreover, the appendix indicates that the defendants considered adding other

18

features, including reduced access points, R. 21988–89; wider shoulders, R. 21994 (Table 7-6); medians, and "J-turns," R. 21974, into all of the passing-lane alternatives. The plaintiffs have not identified any specific feature or collection of features that the defendants should have considered incorporating into the passing-lane alternatives but did not. Accordingly, I cannot conclude that the defendants' discussion of alternatives was deficient on the ground that they failed to consider a comprehensive passing-lane alternative.[5]

## C.    Failure to Consider Induced Travel

The plaintiff contends that the defendants did not account for or address the environmental impacts of "induced travel." This term refers to an increase in either the number of automobile trips or the distance of those trips caused by roadway improvements (typically expansions) that reduce congestion and therefore make traveling by automobile less burdensome. See Todd Litman, Victoria Transport Policy Institute, Generated Travel and Induced Travel: Implications for Transport Planning 3–4 (Jan. 15, 2015). For example, reducing congestion on an urban highway will cause some people who would have taken other modes of transportation, such as mass transit, to begin taking their cars. It will also

---

[5]At various points in its briefs, the plaintiff contends that over the years WisDOT has treated the passing-lane alternatives unfairly by, among other things, "throwing away" data that was favorable to those alternatives and performing a biased "Benefit/Cost analysis." See Pl. Rev. Br. at 11 n.9, 29–33, 58–59; Reply Br. at 13. However, the plaintiff does not connect any of these issues to the analysis of reasonable alternatives that appears in the final impact statement. The plaintiff does not point to anything in the impact statement that would have changed had the defendants not "thrown away" the allegedly favorable data and does not show that the cost-benefit analysis was incorporated into the impact statement or used as a reason for choosing the selected alternative. Thus, I will not further discuss these issues regarding WisDOT's supposed hostility towards the passing-lane alternatives.

Case 2:11-cv-00545-LA   Filed 05/22/15   Page 19 of 26   Document 61

cause some people to make trips that they otherwise would not have made.  For example, because of highway congestion, a person might order an item from the Internet rather than drive to a store.  But with congestion reduced, driving to the store seems more attractive.  Reducing congestion also encourages people to make longer trips.  For example, because of congestion, a person might drive to a neighborhood store rather than drive a longer distance to a large retailer or a shopping mall.  Any additional miles driven as a result of the highway improvements that reduce congestion would be considered induced travel.  See id.[6]

It is true that the defendants do not discuss induced travel in detail in the impact statement.  However, in their discussion of impacts on air quality, the defendants acknowledge that expanding Highway 23 to four lanes will result in new vehicle trips and additional vehicle miles traveled and therefore cause some increase in harmful emissions.  See R. 21531 (Table 4.4-10), 21536–37 (stating that expanding highway will increase number of vehicles on highway and pointing out that recently completed bypass project in Fond du Lac generated "new trips that would not have occurred without the bypass"), R. 21538 (stating that expansion project "is projected to produce more vehicle miles traveled" and cause slightly increased emissions).  In the context of this particular highway

_____

[6]Closely related to induced travel is the idea that expanding highway capacity will lead to increased urbanization or sprawl.  See Highway J Citizens Group, U.A. v. U.S. Dept. of Transp., 656 F.Supp.2d 868, 886–88 (E.D. Wis. 2009).  In the present case, the plaintiff does not contend that the agencies failed to consider the effect of expanding the capacity of Highway 23 on growth in the area surrounding the highway.  See Reply Br. at 12 (stating that defendants' consideration of induced growth is not at issue in this case).  And I note that the impact statement explains that expanding Highway 23 to four lanes will cause additional growth and otherwise affect land-use patterns in the region.  See, e.g., R. 21478, 21491, 21492, 21500.

project, this is an adequate discussion of the environmental impacts associated with induced travel. As far as I can tell, air quality is the only resource that induced travel (as opposed to induced growth) will affect, and the defendants have acknowledged that induced travel will lead to higher emissions and somewhat lower air quality.

The plaintiff points out that WisDOT's traffic forecasts do not account for induced travel. Although WisDOT's methodology takes "diverted" traffic into account—that is, traffic that congestion diverts from Highway 23 onto other routes, see R. 21414—it does not seem to account for brand new or longer trips that are taken as a result of reduced congestion. However, the plaintiff does not identify any established methodology that WisDOT could have used to quantify the amount of induced travel associated with expanding Highway 23. Moreover, the plaintiff does not explain how modeling induced travel would have improved the discussion of environmental impacts that appears in the impact statement. Even without modeling, the impact statement acknowledges that increased travel will lead to higher emissions, and thus the environmental impact of induced travel has been disclosed. Accordingly, I conclude that the impact statement adequately accounts for the environmental effects of induced travel.

## D.    Failure to Respond to Comments From Other State Agencies

The plaintiff's remaining argument is that the defendants did not properly respond to comments they received from the Wisconsin Department of Natural Resources and the Wisconsin Department of Agriculture, Trade, and Consumer Protection, in violation of a NEPA regulation that requires an agency preparing a final impact statement to respond to comments received about the draft statement. See 40 C.F.R. 1503.4. These comments were made in early 2005, after the defendants issued their first draft environmental impact

21

statement.  Although the plaintiff contends that the defendants failed to properly respond to a variety of comments by these agencies, its argument focuses on the defendants' failure to respond to the agencies' comments about the defendants' failure to evaluate a "comprehensive" passing-lane alternative that included traffic-management features in addition to passing lanes.  See Reply Br. at 10–12.  However, the defendants did respond to the DNR's comment about a comprehensive passing-lane alternative by explaining that they considered such an alternative.  R. 21834.  Although they did not separately respond to many of the Department of Agriculture's comments, other than to state that the comments were "acknowledged," R. 21838, I do not think this resulted in a violation of NEPA.  The defendants extensively discussed the passing-lane alternatives in the body of the impact statement and in a technical appendix.  They also responded in detail to comments by the plaintiff about the passing-lane alternatives and about other issues similar to those raised by the Department of Agriculture, such as whether safety issues truly required expanding Highway 23 to four lanes.  R. 21886–99.  This was sufficient to serve the goals of informed decisionmaking and informed public participation.  Accordingly, I will not grant relief in connection with the defendants' responses to comments they received from other agencies.

## IV.  REMEDY

In the discussion above, I identified two deficiencies in the defendants' consideration of reasonable alternatives: (1) the defendants have not sufficiently disclosed how they applied their traffic-forecasting methodology to arrive at the traffic projections that they used in the impact statement, and thus neither the court nor members of the public are able to intelligently assess whether those projections are flawed; and (2) the defendants

22

have not shown that they made a reasoned decision as to whether the updated population data from the Department of Administration required reconsideration of the traffic projections. These are significant deficiencies. One of the main purposes of the project is to accommodate expected future traffic volumes on Highway 23. R. 21326. If it is true that the defendants' projection of traffic volumes is flawed, then one of the key rationales for expanding the highway to four lanes will be undermined. If accurate projections are used, it may turn out that an alternative to full-blown expansion, such as installing passing lanes in certain areas and making other targeted improvements, would satisfy enough of the project's purpose and need to be feasible. And because such an alternative would have fewer adverse environmental impacts than full-blown expansion, NEPA requires that it be fully explored before the defendants irrevocably commit themselves to expanding Highway 23 to four lanes. Of course, after further consideration of these issues, the agencies might decide to proceed with the full-blown expansion even if it turns out that future traffic volumes will be lower than expected and a passing-lane alternative is feasible. Or the agencies might be able to show that their existing projections are not the product of a flawed methodology. But at least in these instances the public will have the benefit of a proper discussion of the issues and will be better able to understand and, if appropriate, criticize the decisions made by their representatives.

Because the decision to expand Highway 23 to four lanes was based on violations of NEPA that have significantly affected informed decisionmaking and informed public participation, I find that it is appropriate to vacate the record of decision dated March 17, 2014, and to remand the matter to the agencies for further consideration. See 5 U.S.C. § 706(2). On remand, the agencies must prepare a document that explains exactly how

23

they arrived at the projections of future traffic volumes that appear in the impact statement by identifying the separate results of the TAFIS projection and the TDM projection, identifying how those results were altered or adjusted, and explaining how any compromise between the results of the two projections was reached.

Also on remand, the agencies must consider whether the updated Department of Administration population data will significantly change the traffic projections that appear in the impact statement and, if so, whether that affects the agencies' consideration of reasonable alternatives. If they consider these questions and conclude that the updated population data does not significantly change the traffic projections or affect the consideration of reasonable alternatives, then they must explain in writing why not, at which point the plaintiff may challenge this decision and I will review it. If they consider these questions and conclude that the updated population data is significant, then the agencies must prepare an appropriate NEPA document addressing the new information. Whether that is a supplemental environmental impact statement or some other document is a question I leave for the agencies to decide in the first instance.

The plaintiff asks that I also issue a permanent injunction prohibiting the defendants from proceeding with any activities approved in the now-vacated record of decision. However, at this point, the record does not indicate that an injunction is warranted. Because I have decided to vacate FHWA's record of decision approving the use of federal resources for the expansion of Highway 23, it seems to me that, as a practical matter, the project cannot move forward until FHWA cures the deficiencies identified above and issues a new record of decision. See Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165–66 (2010) (noting that vacatur of agency decision may render injunctive relief

24

unnecessary).  Perhaps WisDOT could continue with the project immediately without using federal funds, but I doubt that would happen.  In any event, WisDOT has asserted various defenses that would need to be addressed before I could enter injunctive relief against that agency.  <u>See</u> Def. Br. at 41.

An injunction would also be premature because the plaintiff has not submitted evidence from which I could conclude that the defendants are about to take action that will cause irreparable harm, such as beginning construction on the project immediately and destroying environmental resources in the process.  <u>See</u> <u>Monsanto</u>, 561 U.S. at 156–57 (noting that proof of irreparable injury is prerequisite to injunctive relief).  Although WisDOT's website states that construction on Highway 23 will commence sometime in 2015, http://www.dot.wisconsin.gov/projects/neregion/23/, the website is not part of the record, and there are no affidavits or stipulations in the record indicating that construction is imminent.  Moreover, perhaps any imminent construction would not harm environmental resources, or perhaps such construction would be necessary even if, after reconsideration, the defendants choose one of the passing-lane alternatives.   In any event, the defendants might voluntary cease any planned construction activities now that the record of decision for the project has been vacated.   Until it is shown through competent proof that the defendants intend to move forward with the project despite my having vacated the record of decision and that such action would cause irreparable harm, injunctive relief would be premature.

Accordingly, for the time being, the only relief I will award is an order vacating the March 17, 2014 record of decision and remanding the matter to the agencies.  However,

I will set a status conference to determine whether further proceedings on the plaintiff's request for injunctive relief, including an evidentiary hearing, are needed.

### V. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the March 17, 2014 record of decision approving the expansion of Highway 23 to four lanes is **VACATED** and that this matter is **REMANDED** to the agencies to correct the deficiencies identified above.

**IT IS FURTHER ORDERED** that a telephonic status conference will be held on **June 1, 2015 at 10:30 a.m.** for the purpose of determining whether further proceedings are needed on the plaintiff's request for injunctive relief. Counsel should cal the court to advise of their participation.

Dated at Milwaukee, Wisconsin, this 22nd day of May, 2015.


s/ Lynn Adelman

_____
LYNN ADELMAN
District Judge

26